McCORRISTON MILLER MUKAI MacKINNON LLP

ROBERT G. KLEIN           #1192-0
CHRISTOPHER J. COLE       #5781-0
Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, Hawaii  96813
Telephone No.: 529-7300
Facsimile No.:  524-8293
E-mail:  klein@m4law.com/cole@m4law.com

Attorneys for Plaintiff
Kahala CCM Factors, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KAHALA CCM FACTORS, LLC,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>HIRAM L. FONG, ALSO KNOWN AS<br>HIRAM L. FONG, SR., et al.<br><br>　　　　　Defendants. | CIVIL NO. CV-02-00383 SOM/BMK<br>(CONTRACT)<br><br>PLAINTIFF KAHALA CCM<br>FACTORS, LLC'S REPLY<br>MEMORANDUM IN SUPPORT<br>OF IT'S MOTION FOR AN<br>ORDER APPROVING REPORT<br>OF COMMISSIONER AND<br>CONFIRMING THE SALE OF<br>COLLATERAL (1,963 SHARES<br>OF STOCK IN FINANCE<br>ENTERPRISES, LTD.) AT<br>PUBLIC AUCTION FILED<br>DECEMBER 13, 2006;<br>DECLARATION OF<br>CHRISTOPHER J. COLE;<br><br>[CAPTION CONTINUED ON NEXT PAGE] |

|   |   |
|---|---|
| ) EXHIBITS 6-15; CERTIFICATE | |
| ) OF SERVICE | |
| ) | |
| ) | |
| ) | |
| ) DATE: | February 6, 2007 |
| ) TIME: | 10:30 a.m. |
| ) JUDGE: | Susan Oki Mollway |

### PLAINTIFF KAHALA CCM FACTORS, LLC'S REPLY MEMORANDUM IN SUPPORT OF IT'S MOTION FILED 12/13/06

Plaintiff Kahala CCM Factors, LLC ("Plaintiff" or "Kahala") respectfully submits this omnibus reply to all oppositions and objections filed against the subject motion in this court.

Many of the issues raised do not involve Kahala, which has been caught in the cross-fire of a fight to control Finance Enterprises, Ltd. Lost in all the salvoes is the fact that no one has articulated any real objection to the Commissioner's report of the auction (Exhibit 1 to motion), or the manner in which the auction was conducted. Commissioner Jay T. Suemori has discharged his duties. The auction was conducted pursuant to two final foreclosure Judgments of this Court that were obtained with the permission of the bankruptcy court and relied upon by Kahala when it acquired predecessor plaintiff N. Harwood's claims.

Under the foreclosure decrees, Kahala is entitled to either: (1) judicial confirmation of its purchase of the pledged shares at the auction on November 1, 2006, or (2) cash in the full judgment amount at the hearing on February 6, 2007. Any objecting party seeking to delay either outcome ought to be made to post an appropriate security bond (traditionally, double the judgment). Unless and until one of these two events occurs, the secured debt will continue to grow under the judgments. It is time to complete this foreclosure, without getting side-tracked by

extraneous issues. Due to space limitations, this Reply does not address each and every point raised. That shall not be taken as a concession of any matter.

I.   BACKGROUND

In the early 1990's, Rodney Fong (Rodney) owned 1,092 shares, Hiram Fong, Jr. (Hiram, Jr.) owned 630 shares, and Ellyn Fong (Ellyn) owned 241 shares, respectively, of Finance Enterprises, Ltd. ("FE") stock. Hiram Fong, Sr. and Rodney borrowed money from the Bank of Honolulu on this stock, as follows:

| Date | Principal | Debtor | Guarantor(s) | Collateral |
|---|---|---|---|---|
| 12-14-93 | $555,000 | Rodney/Patsy | Hiram, Sr. Ellyn | Rodney's 1,092 + Ellyn's 241[1] |
| 1-26-94 | $590,000 | Hiram, Sr. | Ellyn | Hiram, Jr.'s 630 + Ellyn's 241 |
| 1-27-94 | $200,000 | Hiram, Sr. | Ellyn | Ellyn's 241 |

See Exhibit 6 (2/3/04 Foreclosure Judgment) to this Reply; Exhibit 7 (12/1/04 Foreclosure Judgment); Exhibit 8 (First Amended Complaint filed in this action on February 3, 2003, "Am. Compl."), and selected exhibits thereto, each of which is adopted herein by this reference.

Thereafter, the Bank of Honolulu failed, and the Federal Deposit Insurance Corporation (FDIC) succeeded to its claims as its receiver in liquidation. The

---

[1] Kahala asserts that Ellyn pledged her 241 shares of FE stock to secure not only Hiram, Sr.'s $200,000 contemporaneous loan (Ex. 27 to Am. Compl.), but also to secure Ellyn's own debt under "related documents", defined to include any guaranty "executed in connection with [the $200,000 note]." Ellyn signed the guaranty (id., Ex. 40) the same day that she signed her pledge agreement (id., Ex. 29) and Hiram, Sr. signed the note. In it, she guaranteed all of Hiram, Sr.'s past and future debt including the $590,000 promissory note he signed the day before (Id., Ex. 1) and his guaranty of Rodney's $555,000 loan signed six weeks earlier (Id., Ex. 39). The decrees (Exhibits 6 and 7, attached) establish that Ellyn's 241 shares secured Hiram, Sr.'s $200,000 loan, but did not adjudicate the pledge agreement's coverage of her guaranty.

56564/154399.1                                                  2

FDIC, in turn, assigned the loans to N. Harwood Street Partners I, L.P. ("N. Harwood") in March, 2001. See Exhibit 6, at p. 5, ¶10; Exhibit 7, at p. 6, ¶15.

Rodney and Hiram, Sr. defaulted on all three loans. See Ex. 6, at ¶12; Ex. 7 at ¶17. On January 9, 2002, N. Harwood sent notices of default. See Ex. 6, at ¶13; Ex. 7 at ¶18. On June 24, 2002, N. Harwood initiated this suit. Thereafter, Hiram, Sr. and Ellyn Fong, and Hiram, Jr. filed for bankruptcy. The bankruptcy court, on motion, lifted the automatic stays to permit N. Harwood to foreclose on all of the collateral, on condition that N. Harwood would not seek deficiency judgments. See Exhibits 10-11 attached hereto. No one appealed the stay lift orders. N. Harwood then proceeded to move for summary judgment and obtained Rule 54(b)-certified foreclosure judgments against all Hiram, Sr., Ellyn, Hiram, Jr., and Rodney and Patsy Fong (collectively, the "Fongs") which liquidated the debt owed on the loans,[2] established the per diem interest rate to be applied from that point forward, appointed Jay T. Suemori as commissioner, and established foreclosure procedures pursuant to Hawaii statutory requirements and established custom. See Exhibits 6 and 7 hereto. No one appealed either of these final foreclosure decrees. Then, Rodney and Patsy Fong filed for bankruptcy, and N. Harwood obtained a stay lift order as to them in April, 2006. See Exhibit 9. No one has appealed that stay lift order, either.

On September 1, 2006, Plaintiff, in reliance on the foreclosure decrees and stay lift orders, acquired N. Harwood's claims against the Fongs. See Motion to Substitute; Declaration of Bradley E. Smith, filed on 09/28/06 and adopted herein by reference. Commissioner Suemori scheduled a foreclosure auction sale for November 1, 2006 at noon, and duly published notices in the Honolulu Advertiser.

---

[2] $536,753 on 12/14/93 loan to Rodney, as of January 13, 2004; $821,280 on 1/26/94 loan to Hiram, Sr., as of September 17, 2004; and $218,185 on 1/27/94 loan to Hiram, Sr., as of September 17, 2004.

See Exhibit 1 to this motion (Commissioner's Report). Plaintiff moved to be substituted into this action and separately moved for an order specifying the sums it was entitled to credit-bid at the auction under the Foreclosure Judgments. See orders granting Kahala's motion to substitute, filed 11/29/06 (Ex. 12 hereto), and confirming credit bid amounts, filed on 11/03/06 (Ex. 13 hereto).

On November 1, 2006 at noon, the auction was held. Trustee Kotoshirodo, Trustee Loomis, Fong, Jr., FE, and Kahala, all attended through counsel or in person. See Declaration of Christopher J. Cole. Id. Commissioner Suemori announced at FE's request that all sales were subject to rights of refusal. Id. Kahala was the only bidder. Id. In making its bids, Kahala orally notified all present the credits it had estimated as of that date to be applied toward its bid. Id. Because, at the time, Kahala's estimated credits were insufficient to cover the entirety of its bid on Rodney's 1,092 shares, FE's counsel insisted that Kahala be directed to pay 10% of the cash "portion" of the estimate by close of business. Id. Kahala's bids on the other two lots were fully supported by its estimates. Id. Commissioner Suemori directed Kahala to pay cash equal to 10% of what it had estimated to be its shortfall as of 11/1/06, which Kahala later paid. See Ex. 2 to the instant motion.

II. SUMMARY CHART OF OPPOSITION ARGUMENTS AND REPLIES

None of the opposition arguments warrants denial of the instant motion. This is a chart summarizing the opposing arguments and Kahala's replies thereto:

| Party | Opposition argument | Reply |
|---|---|---|
| Kotoshirodo; Loomis; Rodney and Patsy Fong | The stay lift order did not divest trustee of an interest in the 241 or 1,092 shares of Ellyn and Rodney, respectively. | The trustee's interest lies in any surplus proceeds of foreclosure sale, not a right to sell shares. |
| | Trustee has a right of redemption. | Any right expired. In any case, redemption requires cash payment in full. |

|  |  |  |
|---|---|---|
|  | The trustees have pending contracts to sell the shares to Tomato Bank. | The stock is already sold. Trustees had and have no power to sell them to begin with. |
|  |  | FE raised an issue over whether the Tomato Bank sale is legal. |
|  |  | 241 shares are not needed for Kotoshirodo's sale. |
|  | Bankruptcy court retains jurisdiction to determine the amount of the claim. | District court has jurisdiction to complete foreclosure, including sale of the stock pursuant to final foreclosure decrees. |
|  | Bankruptcy court retains jurisdiction to determine redemption amount. | If redemption right is still alive, final foreclosure decrees already decided that issue. |
|  | Raises question whether sale of Market City shares was reflected in judgment. | The 2/3/04 foreclosure judgment took that sale into account. |
| Finance Enterp.; Sai Investment | Confirmation would infringe on rights of refusal. | Rights of refusal are fully protected. Confirmation is subject to, not contingent on, rights of refusal, which should not delay the confirmation. |
|  |  | Other shareholders claim FE and insiders have unclean hands. |
|  | Assignment of loan from N. Harwood to Kahala was actually a sale of stock triggering rights of refusal. | Sale of a secured loan is not the sale of collateral. Rights are determined by judgment, not the value of collateral or the consideration paid for the claim. |
|  |  | Argument proves too much. Secondary loan market and credit bidding are well-established, customary and legal practices in the lending industry. |
|  |  | Did not object to credit bidding in foreclosure decrees, to Kahala's motion to substitute, credit bid order, or credit bidding at auction. |

III. DISCUSSION

    A. Trustees' and Rodney/Patsy Fong's Oppositions are Without Merit

        1. This Court and Commissioner Suemori Have the Jurisdiction to See the Foreclosure Sale Through to Completion

The bankruptcy trustees argue this Court should not confirm the foreclosure sale to Kahala because they filed motions in bankruptcy court seeking permission to sell the shares after Kahala filed the instant motion to confirm the auction sale. This argument is without merit for at least three reasons.

First, the power to sell the collateral and disburse the proceeds lies with Commissioner Suemori and this court under the foreclosure decrees. Indeed, the sale has already occurred. If any person wants to buy the shares now, he or she must pay at least 105% of Kahala's bid price at the hearing, or exercise any rights of refusal that may apply. The bankruptcy court consented to this court's adjudication of such matters when it lifted the stay so that N. Harwood could foreclose on the pledged stock. "When the bankruptcy court has lifted the stay, federal courts have given subsequent state decisions full faith and credit, as they have by law or usage in the courts of such State . . . *Gajkowski*, 888 F.2d at 299 (holding that, *once the stay was lifted, the state court was free to proceed and its decision on the merits was binding on the bankruptcy court . . .*)." Gruntz v. County of Los Angeles, 202 F.3d 1074, 1084 (9th Cir. 2000) (emphasis added). Because an automatic stay arises by operation of law, once it is lifted the order is irrevocable and bankruptcy court has *no authority to reinstate it*. In re Canter, 299 F.3D 1150, 1155 n.1 (9th Cir. 2002).

Catalano v. C.I.R., 279 F.3d 682 (9th Cir. 2002), a tax law case cited by trustees, does not say what they ascribe to it. Catalano merely held that, as between the bankruptcy estate *and the debtor himself*, an order lifting the stay did not "by itself" mean that the estate abandoned its interests in the property such that

the debtor could lawfully deduct certain depreciation expenses on his tax returns. That is a far cry from holding that, as between the bankrupt estate *and the creditor*, an order lifting the stay to permit foreclosure means that the bankruptcy estate nevertheless retains the power to sell the collateral free and clear of liens.

By lifting the stay to permit foreclosure, Judge Faris knew that N. Harwood would sell the collateral to pay off the secured debt in a judicially supervised process. See Allen v. Watkins, 234 F.2d 925, 927 (5th Cir. 1956) (bankruptcy trustee cannot object after foreclosure sale after acquiescing in foreclosure conducted outside of bankruptcy court). To the extent the bankruptcy estate retains an interest in the collateral, as stated in the Catalano decision, it is merely an interest in any surplus generated out of the foreclosure sale, not a right to sell the shares free and clear. Trustee Kotoshirodo recognized this fact, too. See Exhibit 14 hereto (Trustee's said in 11/22/06 motion for discovery that "even though this court has granted secured creditors' relief from the automatic stay, the Estate retains an interest in *the proceeds* of the sale of those shares.") (emphasis added). This may explain why Trustee Kotoshirodo negotiated for the minimum 2,500 escape valve in his Tomato Bank contract so that he could complete the sale without the 241 shares. In short, the stock is subject to this court's jurisdiction for disposition and determination of what, if any, surplus may remain for distribution to the Fongs or their bankruptcy trustees after confirmation of the sale.

Second, Trustee Kotoshirodo does not need the 241 shares to complete his sale to Tomato bank, which only requires a minimum of 2,500 out of the 2,789 shares he has asked Judge Faris to let him sell. If Tomato Bank wants all of them, it is free to overbid at the hearing.

Third, in briefs filed last Friday in bankruptcy court opposing the trustees' motions to approve the Tomato Bank sale, of which judicial notice is requested, FE raised an issue about whether Tomato Bank may legally acquire more than 5% of

its shares under federal banking laws. If true, then the Tomato Bank deal is illegal, cannot be completed, and should not stand in the way of this motion.

   2. <u>Any Right of Redemption Expired, at the Latest, When Commissioner Suemori Closed the Bidding at the 11/1/06 Auction.</u>

  Courts have held that a debtor's right to redeem collateral subject to foreclosure falls out of the bankruptcy estate upon (1) entry of the decree of foreclosure; (2) entry of the order appointing a commissioner to sell the collateral; or (3) the "fall of the hammer" at the foreclosure sale, even if it is subject to later confirmation or delivery of conveyance instruments. <u>In re Bobo</u>, 246 B.R. 453, 455-6 (D. Colo. 2000) (collecting cases).

  There is no statutory right to redeem collateral in foreclosure proceedings under Hawaii's statutory scheme. <u>Federal Home Loan Mtg. Corp. v. Transamerica Ins. Co.</u>, 89 Haw. 157, 165, 969 P.2d 1276, 1284 (S. Ct. 1998); <u>Brown v. Bannister</u>, 15 Haw. 271, 272 (1903). An equitable right to redeem recognized at common-law terminates at the foreclosure sale. <u>Cooper v. Island Realty Co.</u>, 16 Haw. 92, 105 (1904); <u>Brown</u>, 15 Haw. at 272.

  The trustees claim a right to redeem the collateral under Hawaii's version of Article 9 of the Uniform Commercial Code. Assuming, for sake of argument, that article 9 controls this foreclosure action, any right to redeem collateral expires upon: (1) any disposition of the collateral; (2) making a contract to dispose of the collateral; or (3) the creditor's purchase of the collateral in foreclosure. Haw. Rev. Stat. § 490:9-623(d); 490:9-610; 490:9-601. Section 601 specifically authorizes a secured creditor to purchase at a judicial foreclosure sale "and thereafter holds the collateral free of any other requirements of this article." Haw. Rev. Stat. § 490:9-601(a), (f). Trustee Kotoshirodo cites no authority in support of his assertion that the bankruptcy court retains jurisdiction over the amount needed to

redeem. The Ninth Circuit stated in Gruntz, supra, that the bankruptcy court is bound by any rulings made after it lifts the stay. The final foreclosure decrees adjudicated the amounts of the secured debt and interest, leaving only fees, costs and charges to be determined at the confirmation hearing. See Exhibits 6 and 7.

        3.    Trustees Must Exercise Any Right of Redemption by Making a Full Cash Payment of the Foreclosure Judgments at the Confirmation Hearing.

Even assuming, for argument, that the trustees or Fongs still have a right of redemption, they must "tender fulfillment of all obligations secured by the collateral", including all attorneys' fees and costs incurred. Haw. Rev. Stat. § 490:9-623(b). "A tender of fulfillment obviously means more than a new promise to perform an existing promise. *It requires payment in full of all monetary obligations then due* and performance in full of all other obligations then matured." Id., comment 2 (emphasis added). As the trustees concede, any such right is cut off by judicial confirmation.

The foreclosure decrees direct that the balance of the auction bid price is due in cash on confirmation, and that the secured debt includes the liquidated amounts set forth in the decrees, plus interest at specific per diem rates, late charges, and such fees and costs are found by the court to be owed. See Exhibit 6, p. 6 at ¶¶14, 16, p. 7 at ¶3, pp. 8-9 at ¶2, p. 11-12 at ¶7; Exhibit 7, at pp. 7-8 at ¶¶19-20, 22, p. 9 at ¶¶3-4, p. 11 at ¶4, p. 13-15 at ¶9. These "payoff" amounts are set forth as of February 6, 2007 in the attached declaration of Bradley E. Smith, and should be paid to the Commissioner in cash by any over-bidder or redeeming debtor.

        4.    The 2/3/04 Foreclosure Decree took into Account and Properly Credited the Sale of Market City, Ltd. Stock

Trustee Loomis further argues that the credit bid amounts are unclear, and specifically whether they accounted for the sale of Market City, Ltd. stock. That

sale took place prior to entry of the foreclosure decree, and was factored into the amounts stated therein. See Exhibit 6, at p. 2 (referencing the Supplemental Declaration of William Douning filed herein on 1/16/04; judicial notice is hereby requested). The secured debt credit amounts that Kahala has calculated that it may apply toward its auction bids as of date of the hearing date are as follows:

**1,092 shares (Lot #1):**  Principal + interest as of 11/1/06:  $894,547.08
Interest (97 days x $349.75):  33,925.75
Allocated[3] fees/costs:  121,497.62
Cash down-payment on 11/1/06:  12,115.72
Late charge (5% x principal in decree)  26,837.64

Total Credit, Lot #1, as of 2/6/07:  $1,088,923.81
Bid at auction:  1,097,460.00

Surplus (due from Kahala):  $8,536.19

**630 shares (Lot #2):**  Principal + interest as of 11/1/06:  $1,089,562.08
Interest (97 days x $346.17):  33,578.49
Allocated fees/costs:  70,093.69
Late charge:  41,064.02

Total Credit, Lot #2, as of 2/6/07:  $1,234,298.28
Bid at auction:  1,148,137.60

Deficiency (no judgment permitted by stay lift order):  $86,160.68

**241 shares (Lot #3):**  Principal + interest as of 11/1/06:  $288,733.26
Interest (97 days x $91.03)  8,829.91
Allocated fees/costs:  26,813.62
Late charge:  10,909.25

Total Credit, Lot #3, as of 2/6/07:  $335,286.04
Bid at auction:  307,889.34

Deficiency (no judgment permitted by stay lift order):  $27,396.70

---

[3] Allocations were made pro rata on a per-share basis, e.g. Lot #1 = 1,092/1,963 = 55.63%.

56564/154399.1                              10

See Exhibits 1 (Comm'r Report), 2 (N. Harwood fees and costs statement); 6 (2/3/04 foreclosure decree), 7 (12/1/04 foreclosure decree), 12 (order setting credit bid amounts for principal and interest as of 11/1/06), and 15 (Brad Smith declaration supporting Kahala's fees and costs through 12/31/06).

        5.     The Claims-Allowance Process Does Not Permit Interference with this Court's Foreclosure Action

As noted above, the stay lift order is final, and so are the foreclosure decrees. Trustee Loomis' approach is not as unreasonable as Kotoshirodo's: Although Ms. Loomis seeks to sell the shares that have already been sold at auction, at least she concedes that the foreclosure decrees are binding on the bankruptcy court as to the amounts owed. However, the foreclosure *in this court* involves not only selling the collateral, but also directing the disbursement of the proceeds. See Exhibit 6, at p. 12, ¶7; Exhibit 7, at p. 14, ¶7 ("the court shall determine [fees and costs] and . . . shall direct the final payment of the proceeds of the foreclosure sale."). The decrees were entered before Judge Faris lifted the stay to permit foreclosure against Rodney and Patsy Fong. See Exhibit 9. No bankruptcy code provision authorizes the bankruptcy court to interfere with this court's proceedings after already having irrevocably lifted the stay to permit them.

The claims allowance process as to Kahala's proof of claims in bankruptcy court will not occur unless and until Kahala seeks to pursue a deficiency after the collateral has been exhausted. The bankruptcy court was clearly concerned with deficiency judgments, and expressly carved that out of the stay lift orders, but no more than that. The trustees' cases, Carey v. Ernst, 333 BR 666 (S.D.N.Y. 2005); In re United States Lines, Inc., 199 BR 476 (S.D.N.Y. 1996); and Kohn v. Leavitt-Berner Tanning Corp., 157 BR 523 (E.D.N.Y. 1993) are distinguishable. Those cases involved unsecured judgments. None involved the bankruptcy court lifting the stay to allow a creditor to foreclose on collateral in another court. Only

United States Lines involved a stay lift order, but in that case the bankruptcy court expressly reserved final claims-determination jurisdiction after claimants liquidated unsecured tort claims as a starting point.

    B.    Finance Enterprises' and Sai Investment Co.'s Arguments Lack Merit.

        1.    N. Harwood did not Sell Stock to Kahala

FE makes a far-fetched argument that N. Harwood's assignment of its claims to Kahala was really a sale of stock that triggered rights of refusal and entitles FE to discovery as to how much Kahala paid N. Harwood for the claims. If FE's assertions were true, then N. Harwood and Kahala could have saved on legal fees. Kahala would have not have had to substitute into this lawsuit. Instead, all Kahala would have had to do was walk over to FE's offices at Fort Street Mall and demand that FE put its name in the corporate stock registry. Thereafter, Kahala would have been free to sell the shares in any manner it liked, regardless of commercial reasonableness or compliance with the foreclosure statute.

Of course, none of FE's lengthy dissertation about fair market value of collateral and face amounts of loans is consistent with reality. N. Harwood had possession of the stock certificates as collateral to secure the loans. There is no evidence that N. Harwood offered to accept the collateral in full satisfaction of the outstanding debt, nor is there any evidence that, if any such offer were made, the Fongs accepted it. Any such arrangement would have had to be authenticated in writing. See Haw. Rev. Stat. § 490:9-620. Instead, the amount and value of N. Harwood's (and now Kahala's) claims are measured by the loan documents and the foreclosure decrees.

This does not exalt form over substance. If a substantial surplus results from the foreclosure sale, does FE believe Plaintiff is entitled to keep it all? The Fongs and/or their trustees would likely object. Moreover, there is no evidence that N.

Harwood, or Kahala for that matter, gave up their right to pursue a deficiency against the Fongs. They were only ordered not to do so outside of bankruptcy court. FE stridently insists that the assignment of claims was nonetheless a sale of stock under the "unique circumstances" of this case because N. Harwood had the right to credit-bid on the collateral. FE's argument proves too much. The buying and selling of distressed debt and credit-bidding in foreclosure are commonplace practices of creditors. To suggest that such transactions constitute the sale of collateral is absurd.

        2.    <u>The Rights of Refusal Procedures are Reasonable, but in any Case Should Not Delay Judicial Confirmation of the Sale</u>

FE makes several technical arguments about the procedures for exercising rights of first refusal. Sai Investment Co. joined in these arguments. None of the various issues constitute an impediment to confirmation of the sale. First, the rights of refusal are not subject to infringement or impairment because the confirmation is subject thereto.

Second, FE lacks standing to object if it is not ready, willing and able to exercise its right of refusal at the hearing. Other shareholders have filed statements in court asserting that FE has unclean hands. Moreover, there may be other restrictions, or FE may decide not to exercise its rights of refusal. After FE's lawyer complained that the "subject to restrictions" language in the proposed exercise procedures (Ex. 4 to Motion) by citing Haw. Rev. Stat. § 414-111 (corporation cannot buy its own shares if it would render it insolvent), Chapter 412 (statute governing financial holding companies) and applicable contractual or regulatory restrictions. FE can hardly complain that it does not know what applicable restrictions on buying its own stock it may have agreed to in contracts, permit conditions or under regulations it must follow. FE has superior knowledge.

Third, the argument that the procedures truncate the 15-day notice period is utterly without merit. FE has had months of advance written notice of the "terms" by which Commissioner Suemori would sell the collateral on 11/1/06 as detailed in the written foreclosure decrees. FE appeared through counsel at the auction, and did not object to any lack of notice. See Cole Decl., ¶17. After Kahala bid on the collateral, the Commissioner's report gave all parties hereto complete written notice of the *price*. The Commissioner's report was mailed to the parties and filed with the court on November 16, 2006, 82 days before February 6, 2007. The proposed bid procedures and this motion were filed over a month ago.

Kahala circulated proposed right of refusal procedures before filing the instant motion to confirm. Ironically, Kahala's first draft, which attempted to accommodate pro rata exercises and what would happen if there were an "under-allotment", was objected to *by FE*, whose counsel had a problem with splitting up the 15-day period to provide a mechanism for shareholders to make up shortfalls. See Exhibits 4 and 5 to motion. In response, Kahala simplified the entire procedure and gave shareholders a full 15 days after FE's exercise or non-exercise of rights of refusal. See Appendix A.

Fourth, the "in part or in whole" language in the articles of incorporation does not empower FE to force a partial contract with a third-party (in this case, the court). The mirror-image rule and the stipulation in the articles that the offer be given "at the same price and *on the same terms* as would govern upon a transfer to such other person" means that a right of first refusal holder must match the offer made by the third-party to secure a contract. Honolulu Rapid Transit v. Paschoal, 51 Haw. 19, 25, 449 P.2d 123, 127 (1968). If FE refuses the offer in part, then the third-party could nevertheless voluntarily agree to such a "partial" counter-offer by FE. In that circumstance (a partial "refusal"), the Court could conceivably offer the remainder to the shareholders. But what would happen if the shareholders did

not agree to buy all the rest? The purchase would not then be on the "same terms as would govern" the auction sale to Kahala. This court has the discretion as to whether rights of refusal may be exercised by three lots, by stock series, or in one lot. Smith v. Pacific Hts. R. Co., 17 Haw. 96, 106 (1905). It would probably be simplest to keep the bidding according to three lots, consistent with the past practice followed in this case at the auction.

In any case, any issue over rights of refusal should not delay confirmation of the sale. Under the decrees, confirmation was always intended to be "subject to" the rights of refusal, not contingent on it. Kahala is entitled to either (1) a judicial confirmation or (2) payment in cash from an over-bidder (whose purchase would then be subject to rights of refusal).

IV. CONCLUSION

For all of the foregoing reasons, Plaintiff Kahala CCM Factors, LLC respectfully requests that the court grant the motion in its entirety.

DATED: Honolulu, Hawaii, _____ JAN 2 6 2007 _____.

_____
ROBERT G. KLEIN
CHRISTOPHER J. COLE

Attorneys for Plaintiff
Kahala CCM Factors, LLC