**INCLINATIONS**

It is Judge Mollway's practice, whenever possible, to notify attorneys and pro se parties scheduled to argue motions before her of her inclinations on the motions and the reasons for the inclinations.  This is part of Judge Mollway's normal practice, rather than a procedure unique to a particular case, and is designed to help the advocates prepare for oral argument. It is the judge's hope that the advance notice of her inclination and the accompanying reasons will focus the oral argument and permit the advocates to use the hearing to show the judge why she is mistaken or why she is correct.  The judge is not bound by the inclination and sometimes departs from the inclination in light of oral argument.

Judge Mollway attempts to communicate her inclinations no later than one working day before a hearing.  The court's preference is to distribute the inclinations to the parties via the court's electronic filing system ("CM/ECF").  Accordingly, parties are encouraged to participate in the court's CM/ECF system.

The inclination is intended to be only a summary of the court's thinking before the hearing and not a complete legal discussion.  The court will issue a written order with a detailed analysis after the hearing.

The parties are reminded that, under Local Rule 7.4, they may not submit supplemental briefs (such as briefs addressing the inclination) unless authorized by the court. Supplemental declarations, affidavits, and/or other evidence in response to the court's inclinations are prohibited unless authorized by the court.  The parties are also reminded that they must comply with Local Rule 7.8 if they intend to rely on uncited authorities at the hearing.

Occasionally, Judge Mollway does not announce an inclination, especially if materials are submitted to her right before the hearing.  Because briefing on criminal motions closes just a few days before the hearing, it is not uncommon for her to be unable to announce an inclination on a criminal motion until the start of the hearing itself.  Certainly if an evidentiary hearing is scheduled on matters necessary to a decision on either a civil or criminal motion, no inclination will be announced.

Judge Mollway's inclinations may not be cited as authority for any proposition.  However, the inclinations will be electronically filed for the convenience of the parties.

Judge Mollway announces the following inclinations:

**<u>Kahala CCM Factors, LLC. v. Hiram Fong, et al.</u>, Civil No. 02-00383 SOM/BMK**

This case was originally filed by North Harwood Street Partners I, L.P., pursuant to this court's diversity jurisdiction under 28 U.S.C. § 1332. Now that North Harwood Street Partners has transferred its claim to Kahala CCM Factors, LLC ("Kahala CCM"), it appears that the parties are no longer diverse. The court is inclined, however, to rule that it continues to have jurisdiction over this matter, as diversity of citizenship is examined at the time a complaint is filed. See <u>Freeport-McMoRan, Inc. v. K N Energy, Inc.</u>, 498 U.S. 426, 428 (1991); <u>Hill v. Blind Indus. Servs. of Md.</u>, 179 F.3d 754, 757 (9th Cir. 1999); <u>Mann v. City of Tucson, Dept. of Police</u>, 782 F.2d 790, 794 (9th Cir. 1986). If any party believes that this court lacks diversity jurisdiction, that party should come to the hearing prepared to cite authority indicating that, when a plaintiff transfers its interest to an entity such that the parties are no longer diverse, the court's jurisdiction is affected.

On November 16, 2006, Jay T. Suemori, Esq., the court-appointed Commissioner in this case, filed his Commissioner's Report. This report indicated that he held a public auction on November 1, 2006, selling the collateral in this case in three lots:

> Lot 1: 1,092 shares of Finance Enterprises, Inc. ("FE"), to Kahala CCM for $1,097,460.00 (or $1005.00 per share);
>
> Lot 2: 630 shares of FE to Kahala CCM for $1,148,137.60 (or $1,822.44 per share);
>
> Lot 3: 241 shares of FE to Kahala CCM for $307,889.34 (or $1,277.55 per share).

The Commissioner indicated that he is currently seeking $438.01 in expenses and $4,134.51 in fees.

Judge Mollway is inclined: (1) to approve the Commissioner's Report and approve payment of his requested expenses and fees; (2) to reopen the bidding for each of the three lots with the reopened bidding being conducted in three different auctions; (3) to confirm the sale of the shares in Lot 2 to Kahala CCM or any other person or entity who outbids Kahala CCM in any reopened bidding process, subject to the rights of first refusal described below; and (4) if the final bid price the Commissioner obtains in the civil case is higher than the

price obtained by the Bankruptcy Trustees exercising their rights to redeem collateral, to confirm the sales of the shares in Lots 1 and 3 in the civil case as described below, subject to the rights of first refusal described below.

Sandra J. Loomis, the Bankruptcy Trustee for Rodney Leong Fong and Patsy Nakano Fong, entered into a contract on January 17, 2007 (almost three months after the public auction in the civil case), to sell the same 1,092 shares of FE in Lot 1 to TFC Holding, Bank Holding Corporation ("TFC"), for $1,100.00 per share. Ronald Kotoshiroda, the Trustee of the Estate of Hiram Fong, Sr., and Ellyn Lon Fong, entered into a contract with Tomato Bank ("Tomato") on December 28, 2006 (almost two months after the public auction in this case), to sell 2,789 shares of FE, including the same 241 shares the Commissioner is selling in Lot 3. This contract apparently states that the shares are being sold to Tomato for $1,000.00 per share. The Trustees apparently attended the public auction in this civil case before entering into their respective contracts to sell the shares.

As an initial matter, the parties should be prepared to discuss what authority the Trustees had to sell the same shares that Judge Faris had already allowed to be sold in this foreclosure case. In other words, because Kahala CCM has a secured interest in the shares of FE in Lots 1 and 3, how did the Trustees have any right to enter into contracts to sell the same shares when they knew that the shares were already being sold by this court? Are the Trustees arguing that their respective contracts are attempts by "debtors" to "redeem" collateral? If yes, will the proceeds from the sales of the shares in Lots 1 and 3 be used to cover the expenses of this civil case and in satisfaction of the debt owed to Kahala CCM, the secured creditor, including reasonable attorneys' fees and costs, with any remaining proceeds being paid into the debtors' respective bankruptcy estates? The cases cited by the Trustees only appear to stand for the proposition that proceeds greater than the secured interest are to be returned to the bankruptcy estate.

TFC entered into a contract with the Trustee to purchase the same 1,092 shares in Lot 1 for $1,100 per share, $95 per share more than the current bid price in this civil case. The parties should come to the hearing prepared to state whether the $1,100 per share price, a total of $1,201,200.00, is sufficient to "redeem" the collateral, covering all of the debt secured by Lot 1, including attorneys' fees and the costs of this civil action. According to Exhibit 12 attached to the Reply, it appears that, as of November 1, 2006, $894,547.08 in principle and interest was owed on the debt secured by the shares in Lot 1.

At the hearing being held before Judge Mollway and Bankruptcy Judge Faris, Judge Mollway is inclined to conduct simultaneous hearings with respect to each of the three lots, to attempt to sell the lots for the highest price, whether via the Commissioner's public auction in this case or via Trustee Kotoshiroda's private sale in the bankruptcy cases. This means that, with respect to Lot 3, Judge Mollway would be inclined to confirm the sale to Kahala CCM, as Trustee Kotoshiroda's private sale of the 241 shares to Tomato Bank is for less than the current bid price in this civil case for the shares. The court is inclined to place any excess proceeds into the bankruptcy estate of Hiram L. Fong, Sr., and Ellyn Lon Fong. Judge Mollway would then be inclined to allow Bankruptcy Judge Faris to decide whether to approve Trustee Kotoshiroda's sale of the remaining 2,548 shares to Tomato Bank for $1,100.00 per share, or 2,802,800.00.

With respect to Lot 1, TFC may reopen the bidding in this civil action with a bid of $1,100.00 per share for a total of $1,201,200.00. Alternatively, the court would be inclined to allow Trustee Loomis to exercise a right to redeem the collateral on the following conditions: (1) the debt to Kahala CCM must be paid out of the proceeds; (2) the Commissioner's costs and fees must be paid out of the proceeds; (3) the _reasonable_ attorneys' fees and costs of Kahala CCM and North Harwood Partners must be paid out of the proceeds; and (4) any excess proceeds would be placed into the bankruptcy estate of Rodney Leong Fong and Patsy Nakano Fong.

In return for Tomato's agreement not to conduct due diligence or to impose any contingency other than court approval, Kotoshiroda agreed that a 5% break-up fee (or $55 per share) would be paid to Tomato in the event Kotoshiroda sold the shares to a party other than Tomato. If the Commissioner in the civil case sells the 241 shares for $1,277.55 or more, Kotoshiroda's agreement with Tomato arguably does not require payment of the "break-up" fee upon Judge Mollway's confirmation of the sale to Kahala CCM or any other person or entity. After all, it would be the Commissioner, not Kotoshiroda, who sold the shares to someone else. Judge Mollway also presumes that Judge Faris would not approve the sale of the 241 shares to Tomato when a higher price had already been obtained by the Commissioner in the civil case, but obviously the issue of the "break up" fee would ultimately lie with Judge Faris.

Before the hearing, the Trustees in the bankruptcy cases and the Commissioner in the civil case should discuss procedures they would like to suggest in conducting overbidding.

This procedure could be as simple as holding simultaneous reopened auctions for the shares being sold in Lot 1 and Lot 3 and then separate auctions for the remainder of the shares being sold in the bankruptcy cases. Judge Mollway anticipates discussing with all parties at the hearing exactly how the 1,092 shares in Lot 1 and the 241 shares in Lot 3 should be sold by Trustees in the bankruptcy cases and by the Commissioner in the civil case.

FE's Articles of Incorporation provide that none of FE's stock shall be transferred "without first offering the stock for sale by written notice to the corporation at the same price and on the same terms as would govern upon a transfer to such other person." Because the Articles of Incorporation indicate that FE may refuse the offer for sale "in whole or in part," Judge Mollway is inclined to allow FE to exercise the right of first refusal for each of the three lots as a whole, or for any lesser amount of shares at the per share price for the lot being sold. Judge Mollway is inclined to ask the Commissioner to prepare and send a written offer to FE via certified mail, giving the company fifteen days after receipt of the offer to exercise its right of first refusal. Judge Mollway is inclined to authorize the Commissioner to offer the shares to FE on the per share price finally obtained during the hearing on the motion for confirmation of sale. Judge Mollway is not inclined to allow FE to purchase the shares at the price Kahala CCM paid for the lien on the shares, as it was the lien being sold, rather than shares of FE.

The Articles of Incorporation of FE further provide that any shares remaining unsold after FE exercises its rights of first refusal shall "be offered for sale by written notice to each of the other stockholders of the corporation in proportion to the number of shares of common stock held by each of them respectively at the same price and on the same terms as would govern upon a transfer to the other person." Judge Mollway is inclined to find this language ambiguous. The language can be read as allowing an FE shareholder to exercise a right of first refusal based on the proportion of shares that shareholder has in relation to (1) the total number of shares including the shares being sold or (2) the total number of shares not including the shares being sold. Judge Mollway asks the parties to come to the hearing prepared to discuss the following hypothetical. Assume there are five shareholders (A, B, C, D, and E), each owning 1,000 shares out of a total of 5,000 shares. If A wants to sell A's shares to F for $100 per share, (1) would B, C, D, and E each have the right to buy 200 shares for $100 per share, as B, C, D, and E each owns 20% of the total stock (1000 out of 5000 shares);

5

or (2) would B, C, D, and E each have the right to buy 250 shares for $100 per share, as each of the four has 25% of the shares not being sold (1000 out of 4000 shares)?

It would help Judge Mollway if shareholders who attend the hearing were prepared to provide either an offer of proof or declaration(s) as to the intent of the parties involved in adopting the right of first refusal provision.  In other words, was the intent when drafting FE's Articles of Incorporation to prevent outsiders from becoming shareholders by giving the other shareholders the right of first refusal with respect to all shares being offered for sale, or just to limit any outsider's ownership share?

If written offers are to be presented to FE's shareholders, Judge Mollway is inclined to ask the Commissioner to prepare and send such written offers via certified mail, giving the shareholders fifteen days after receipt of the offer to exercise their rights of first refusal.

FE should come to the hearing with a letter to the Commissioner indicating the following: (1) the address to which the Commissioner may send FE the certified letter regarding its rights of first refusal; (2) the total number of shares of "common stock" in FE; (3) the names of all of FE's shareholders and their current addresses, as well as the addresses "listed on the corporation book," if different from the current addresses. FE should also bring to the hearing copies of this letter for the court and the other parties.

Judge Mollway is inclined to allow and approve the payment of further costs and fees incurred by the Commissioner as a result of the right of first refusal process outlined in this inclination.

Judge Mollway is not persuaded by the bald assertions that FE (or its shareholders) should be barred from exercising rights of first refusal under the doctrine of unclean hands. Despite ample opportunity, no party has submitted any evidence supporting the unclean hands allegation.  Rather than filing any document demonstrating such unclean hands, the parties have merely asserted such, stating that they can provide evidence of the unclean hands at a later time.  As such evidence could have been submitted earlier, Judge Mollway is not inclined at this point to allow the submission of such evidence, as it would merely serve to further delay this extremely old case.

Although Judge Mollway is inclined to award attorneys' fees to Kahala CCM, she is inclined to deny without prejudice Kahala CCM's request for attorneys' fees, given the absence of any detail regarding the work performed in this case. The reasonableness of the fees claimed cannot be evaluated on the present record. In any refiled motion regarding fees, counsel must provide the detail set forth in Local Rule 54.3. The matter should be presented to the Magistrate Judge.

The parties should also come to the hearing prepared to discuss exactly how the proceeds from any sale of the shares should be distributed.